UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

In re:                                          In a Proceeding Under
                                                Section 304 of the
BOARD OF DIRECTORS OF MULTICANAL S.A.,          Bankruptcy Code

                                                Case No. 04-10280 (ALG)

              Debtor in Foreign Proceeding.

---------------------------------------------------------------x

## MEMORANDUM OF OPINION

A P P E A R A N C E S :

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Attorneys for Board of Directors of Multicanal S.A., Petitioner
        By: Lindsee P. Granfield, Esq.
            Evan A. Davis, Esq.
            Leslie N. Silverman, Esq.
            Timothy S. Mehok, Esq.
One Liberty Plaza
New York, New York 10006

PROSKAUER ROSE LLP
Attorneys for the ARC-Related Parties
        By: Louis M. Solomon, Esq.
            Jennifer R. Scullion, Esq.
            Adam T. Berkowitz, Esq.
1585 Broadway
New York, New York 10036

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

        This is a further chapter in a dispute between an Argentine cable company and

holders of notes that the company issued in the United States.  So far, the dispute has

engendered multiple decisions and appeals in the Republic of Argentina, two decisions

from this Court, one decision from the United States District Court for the Southern

District of New York, and prospective appeals, currently held in abeyance, to the Court of Appeals.

This Court held, in its first decision, that the noteholders' rights under the Trust Indenture Act did not preclude a grant of relief to the petitioner, Board of Directors of Multicanal S.A. ("Multicanal"), under § 304 of the Bankruptcy Code. See *In re Bd. of Dirs. of Multicanal S.A.*, 307 B.R. 384 (Bankr. S.D.N.Y. 2004) ("*Multicanal I*"). In its second decision, familiarity with which is assumed, this Court held that Multicanal was entitled, under § 304, to recognition of its *acuerdo preventivo extrajudicial* ("APE") in Argentina, subject to a cure of discrimination against U.S. retail holders. See *In re Bd. of Dirs. of Multicanal S.A.*, 314 B.R. 486 (Bankr. S.D.N.Y. 2004) ("*Multicanal II*").[1] Multicanal had concluded it would be unable to offer small U.S. noteholders the same choice of cash, securities or a combination of the two that it had offered to large holders because of the apparent effect of the U.S. securities laws; while the offer of securities to certain institutional holders in the U.S. would be exempt as a private resale to qualified institutional buyers ("QIBs") under SEC rule 144A, 17 C.F.R. § 230.144A, there was no apparent exemption for the offer of securities to U.S. non-QIB or "retail" holders.[2] The Court held that while Multicanal had justified its decision to offer U.S. retail holders only cash -- in order to avoid a U.S. securities law problem -- it had not justified the disparity in the amount of cash offered as compared to the value of the packages offered to large holders (as well as holders outside the United States). The Court rejected the relief

---

[1] The published decision of August 24, 2004 was supplemented by a further order entered January 6, 2005.
[2] Since Multicanal had registered its initial offerings under the U.S. securities laws, the number of U.S. retail holders was not negligible. It was calculated that 80% of the Multicanal creditors whose debt would be restructured by the APE were U.S. noteholders and that perhaps 5% of the outstanding aggregate principal amount of the notes, or $25 million in total, was held by U.S. retail investors. *Multicanal II*, 314 B.R. at 494.

recommended by the objecting noteholders, which was to deny recognition of the APE altogether.[3]  It found that there were or appeared to be at least two possible remedies: to give the U.S. retail holders the same choice among securities and cash that all other holders had, or to increase the value of the cash option.  The first option was dependent on compliance with the U.S. securities laws; the latter did not implicate the securities laws.

To cure the discrimination, Multicanal proposed that the U.S. retail holders elect among all of the options under the APE, including the securities options, and for purposes of reallocation, have those elections treated in the same manner as the elections made by all other holders who had consented to the APE and/or had tendered their existing debt on or before December 12, 2003.  For an exemption under the U.S. securities laws, Multicanal relied on a § 3(a)(9) of the Securities Act.[4]  Although Multicanal took the position that it might not have been able to offer securities to U.S. retail holders at the outset of its offering, it believed it could offer them securities later because of the passage of time. The Argentine Court later approved this proposed cure in its May 16, 2005 decision.[5]

---

[3] In prior opinions, the Court defined these noteholders as "Huff," the abbreviated name of one of several related investment advisory firms that apparently bought the notes for its clients and thereafter formed a vehicle called Argentinian Recovery Company LLC ("ARC") to hold the instruments.  Huff manages pension, charitable and other funds.  Its clients include both qualified and non-qualified institutional buyers. Huff had invested substantially in Multicanal's notes before the Argentine financial crisis in 2001 and apparently has increased its holdings in the Multicanal notes during its continuing litigation with Multicanal.  As discussed below, Huff has also proposed the intervention of several other entities that seek to oppose recognition of the APE.

[4] Section 3(a)(9) provides an exemption from registration for securities that are exchanged by an issuer with existing security holders where no commission or other remuneration is paid for soliciting such exchange. This exemption was not available initially because of the fee paid to Multicanal's agent, J.P. Morgan & Co. Multicanal took the position that enough time had passed to make the § 3(a)(9) exemption available.  See *Multicanal II*, 314 B.R. at 520 n.22.

[5] As discussed further below, pursuant to the Argentine Court's May 16, 2005 order, Multicanal offered the same cure given to the U.S. retail holders to the "no" voting and abstaining holders of existing debt.

In an opinion dated September 28, 2005, the District Court affirmed this Court's decisions with respect to the Trust Indenture Act and recognition of the APE under the standards of § 304.  However, the District Court held that Multicanal could not, in offering a cure to the U.S. retail holders, rely on a § 3(a)(9) exemption from the registration requirements of Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e ("Section 5"), because "the exchange of securities under the proposed cure is integrated with an exchange where a 'commission or other remuneration [was] paid or given directly or indirectly for soliciting such exchange.'"  *Argentinian Recovery Co. LLC v. Bd. of Dirs. of Multicanal S.A.*, 331 B.R. 537, 548 (S.D.N.Y. 2005) ("*Multicanal III*").  Finding § 3(a)(9) unavailable, the District Court remanded for a determination whether the exemption under § 3(a)(10) of the Securities Act of 1933 would apply and obviate the need to register the securities under Section 5.

In the meantime, in September 2005, Multicanal had filed a proposed registration statement with the Securities and Exchange Commission (the "Registration Statement"), in which it proposed to register the shares to be issued to the U.S. retail holders. Multicanal did not propose to register the shares to be issued to the QIBs, who had voted in favor of the APE, as this would have required a new vote on the plan -- a vote that it is assumed Multicanal would lose.[6]  Multicanal did propose to register the shares to be made available to holders who had previously voted "no" or who had abstained.  Under rulings of the Argentine courts, Multicanal was required to provide these holders with the same choices made available to other creditors as to the package of consideration they would receive.  In any event, the District Court further instructed this Court to consider

---

[6] It will be recalled that Multicanal obtained approval of the APE by a narrow margin -- 68% of the affected debt voted in favor, whereas the minimum to approve the APE was 66 ? %.  Since the vote, Huff or its allies have acquired what appears to be a blocking position.

on remand whether the securities could be distributed to holders in the United States pursuant to an effective Registration Statement.

The District Court also directed this Court to consider two other issues, namely (i) whether fairness requires that the registration statement be made available to all noteholders, and whether in light of the passage of time and changed economic circumstances, a re-vote of all noteholder creditors should be required; and (ii) Huff's standing to continue voicing the possibly conflicting interests it purports to represent.

On remand, Multicanal argues that an exemption under § 3(a)(10) is available and that the record is sufficient to include the fairness finding required by that provision. Multicanal also contends that since the securities to be issued to the U.S. retail holders will be covered by the Registration Statement and the securities issued to the "yes" voting noteholders will be covered by Section 4(2) of the Securities Act of 1933, 15 U.S.C. § 77d(2), there will be no discrimination, and all of the issued securities will be fungible and freely tradable.  Multicanal also argues that the District Court's integration analysis is only applicable to the § 3(a)(9) exemption and that it can use the safe-harbor of Rule 152 under the Securities Act, 17 C.F.R. § 230.152, to prevent integration of the issuance of securities to the QIBs and the U.S. retail holders.  Huff, on the other hand, argues that a § 3(a)(10) fairness hearing has not been held and that Multicanal must register the entire offering under Section 5.  Huff's position is that the proposed cure and the issuance of shares to the QIBs under the APE are part of a single, integrated transaction, and that partial registration of the shares issued under the cure would be in violation of Section 5. It also asserts that fairness and equity require a re-vote.

This Court observed in its prior opinion, quoting § 304(c), that the "overriding purpose of § 304 is to 'best assure an economical and expeditious administration' of a foreign estate…." *Multicanal II*, 314 B.R. at 501.  In that opinion, the Court assumed that the cure of the discrimination against the U.S. retail holders would be relatively straightforward and that the APE could be rapidly closed.  Multicanal appeared confident of its § 3(a)(9) exemption.  If that exemption were not available, it appeared that a modest increase in the cash offered to the U.S. retail holders would not implicate any issues under the U.S. securities laws, or there might be other cures available.  *Multicanal II*, 314 B.R. at 519-20.  More than a year has passed.  The District Court has ruled out the availability of a § 3(a)(9) exemption.  Multicanal has apparently decided against increasing the cash offered to the U.S. retail holders, which would make their distribution equivalent in value to the distribution available to all other holders.[7]  Multicanal has instead chosen to rely on two possible exemptions under the Securities laws: § 3(a)(10), which it asserts has already been satisfied, and an alternative alleged safe harbor under the securities laws, Rule 152, a rule that has never been the subject of substantive judicial construction and that would create its own reverse discrimination against the U.S. QIBs.

For the reasons stated below, the issues remanded are determined as follows.  In principle, the securities to be exchanged for the notes in the Multicanal APE could be exempt from registration under § 3(a)(10) of the Securities Act upon the finding of

---

[7] Multicanal suggested at oral argument that a change in the consideration offered to U.S. retail holders would raise issues in Argentina that the APE was being amended or amended in a discriminatory fashion, but it never sought relief in Argentina.  The Argentine courts have themselves required Multicanal to rectify treatment that they have found to be discriminatory, requiring, for example, that the creditors who voted against the APE or abstained have the right to choose among the same types of consideration offered to other holders.  The purpose of an amendment for the benefit of U.S. retail holders would be to rectify discrimination, not create it.  (It will be recalled that the U.S. retail holders were initially treated differently from all others.)  It may be that this remedy is no longer available in Argentina, but the record on this point is not clear.

6

"fairness" required under that section, but contrary to Multicanal's position, a "fairness

hearing" has not taken place. A fairness hearing could be held if Multicanal so elects, but

the hearing would have to take place on an expedited basis. Such a hearing could also

determine another issue remanded, whether there has been such a long passage of time

since the APE solicitation that it would be fundamentally unfair to enforce the vote at this

date in the United States.

As for the second principal issue remanded, the Court finds that Rule 152 does

not provide a safe harbor under the U.S. securities laws that would permit the APE to

close at long last and "best assure an economical and expeditious administration" of the

Multicanal estate. With respect to the final issue, although Huff and its counsel have

continually endorsed the positions of possibly conflicting parties in order to oppose the

APE, Huff represents both QIBs and retail holders, and it has also offered to secure the

intervention of other parties, whose interest in the issues under consideration is direct and

concrete. There is no real issue of standing in this proceeding.

## DISCUSSION

### I. Section 3(a)(10) Exemption

The District Court remanded for this Court's consideration the availability of a §

3(a)(10) exemption for the securities to be issued under the APE. Section 3(a)(10) of the

Securities Act of 1933 provides:

> Exempted Securities. Except as hereinafter expressly provided, the
> provisions of this subchapter shall not apply to any of the following
> classes of securities: … (10) Except with respect to a security exchanged
> in a case under Title 11, any security which is issued in exchange for one
> or more bona fide outstanding securities, claims or property interests, or
> partly in such exchange and partly for cash, where the terms and
> conditions of such issuance and exchange are approved, after a hearing
> upon the fairness of such terms and conditions at which all persons to

> whom it is proposed to issue securities in such exchange shall have the
> right to appear, by any court, or by any official or agency of the United
> States, or by any State or Territorial banking or insurance commission or
> other governmental authority expressly authorized by law to grant such
> approval.

15 U.S.C. § 77c(10).  The statutory prerequisites for an issuer claiming a § 3(a)(10)

exemption are as follows: (i) an exchange of securities, claims or property interests; (ii) a

hearing on the fairness of the exchange at which all persons to whom the securities will

be issued pursuant to such exchange may appear and be heard; and (iii) a finding of

fairness and consequent approval by a court or other governmental authority of the terms

and conditions of the exchange.

      The questions before the Court are whether the § 3(a)(10) exemption could apply,

whether the Court in Argentina or this Court could hold a fairness hearing, and whether

on the record to date, such a hearing has been held (as Multicanal asserts).  We will

consider first the history of § 3(a)(10) and its relationship to the exemptions for the

issuance of securities in the U.S. bankruptcy laws because they help inform this Court's

analysis of the jurisdictional issues and the "fairness" requirement in § 3(a)(10).  We will

then consider the jurisdiction of this Court and the Court in Argentina to hold a fairness

hearing, and (preliminarily) the proof that would be necessary to support a finding of

fairness.  We will finally discuss Multicanal's position that such a hearing has already

been held at which a finding of fairness has been made.

### A.  History of § 3(a)(10)

      The § 3(a)(10) exemption was originally enacted as part of a broader exemption

in § 4(3) of the Securities Act of 1933, which provided in relevant part:

      The provisions of § 5 shall not apply to any of the following transactions:

*    *    *

> the issuance of securities to the existing security holders or other existing
> creditors of a corporation in the process of a bona fide reorganization of
> such corporation under the supervision of any court, either in exchange for
> the securities of such security holders or claims of such creditors or partly
> for cash and partly in exchange for the securities or claims of such security
> holders or creditors.

Act of May 27, 1933, ch. 38, § 4(3), 48 Stat. 77.  The purpose of § 4(3) was to

> [exempt] the distribution of securities during a bona fide reorganization of
> a corporation when such a reorganization is carried on under the
> supervision of a court.
>      Reorganizations carried out without such judicial supervision
> possess all the dangers implicit in the issuance of new securities and are,
> therefore, not exempt from the act.  For the same reason the provision is
> not broad enough to include mergers or consolidations of corporations
> entered into without judicial supervision.

H.R. Rep. No. 85, 73d Cong., 1st Sess. 16 (1933).

In amendments to the Securities Act of 1933 that were part of the Securities

Exchange Act of 1934, § 4(3) was moved from § 4 to § 3 and split into several separate

parts, including § 3(a)(10).  Act of June 6, 1934, ch. 404, 48 Stat. 881.  As initially

enacted, § 3(a)(10) exempted from registration

> [a]ny security which is issued in exchange for one or more bona fide
> outstanding securities, claims or property interests, or partly in such
> exchange and partly for cash, where the terms and conditions of such
> issuance and exchange are approved, after a hearing upon the fairness of
> such terms and conditions at which all persons to whom it is proposed to
> issue securities in such exchange shall have the right to appear, by any
> court, or by any official or agency of the United States, or by any State or
> Territorial banking or insurance commission or other governmental
> authority expressly authorized by law to grant such approval.

Act of June 6, 1934, ch. 404, 48 Stat. 881, 906.[8]  The House Report at the time explained

that § 3(a)(10) extended the exemption in § 4(3) "to cover readjustments of rights of

---

[8] Its present form is the same, with the addition of the following introductory clause, which became
effective October 1, 1979: "Except with respect to a security exchanged in a case under Title 11, ...."  15
U.S.C. § 77c(10).  The addition of this clause is discussed below.

9

holders of securities, claims, and property interests under court or similar supervision,
even though the original issuer of the securities, debtor on the claims, or owner of the
property in which interests are held, is not itself in the process of reorganization." H.R.
Rep. No. 1838, 73d Cong., 2d Sess. 40 (1934). The report further explained that §
3(a)(10) placed a limitation on the exemption by adding a requirement that "the approval
of the court or official, in order to be effective, must follow a hearing on the fairness of
the terms and conditions of the issuance and exchange of the securities at which persons
who are to receive such securities shall have a right to appear." *Id*.

At the same time as Congress adopted § 3(a)(10), it also amended the bankruptcy
laws and introduced an express bankruptcy exception to registration. One day after
passage of the Securities Exchange Act of 1934, Congress codified and amended the
equity receivership and added a new statutory reorganization procedure. Act of June 7,
1934, ch. 424, 48 Stat 911, 920. Section 77B(h) provided in relevant part that "[a]ll
securities issued pursuant to any plan of reorganization confirmed by the court in
accordance with the provisions of this section … shall be exempt from all the provisions
of the Securities Act of 1933 [with the exception of the antifraud provisions]."[9] In 1938,
when the Chandler Act amended and recodified the reorganization provisions as Chapter
X and Chapter XI of the Bankruptcy Act, exemptions from the securities laws were
included. Section 264 of Chapter X provided that the provisions of § 5 of the Securities
Act "shall not apply to … any transaction in any security issued pursuant to a plan in
exchange for securities of or claims against the debtor or partly in such exchange and
partly for cash and/or property …." 11 U.S.C. § 664 (repealed). Section 393(a)(2) of

---

[9] Although §§ 3(a)(10) and 77(B)(h) were adopted virtually simultaneously, there is no discussion in the
legislative history of the relationship and overlap between those sections.

Chapter XI was identical but substituted "pursuant to an arrangement" for the words "pursuant to a plan." 11 U.S.C. § 393 (repealed).[10]  The Legislative history noted that § 264 was derived from § 77B(h) but did not mention § 3(a)(10) or the possible relevance of a similar exemption.

During the ensuing years, a period during which § 3(a)(10) coexisted with §§ 264 and 393 of the Bankruptcy Act, a number of commentators took the position that the three provisions were "express duplicative exemptions."  Bloomenthal, *Securities and Federal Corporate Law* at 4-19 n. 440 (1974); see also Salter, *Exemption of Securities from Registration Issued under Chapter X and XI*, 76 Com. L.J. 6,8 (1971) ("the exemption of section 3(a)(10) covers the issuance of securities while the debtor is under the auspices of the court in X and XI"); 1 Loss, *Sec. Regulation* 584 (2d ed. 1961); 4 Loss, *Sec. Regulation* 2598 (Supp. 1969); Corotto, *Debtor Relief Proceedings Under the Bankruptcy Act and the Securities Act of 19833 - - The Registration Requirement and its Implications*, 25 Hastings L.J. 389, 395-96 (1974) (§ 3(a)(10) and "the bankruptcy exemptions are cumulative").  The SEC staff initially took a similar position.  See, e.g., a 1972 no-action letter, stating that § 3(a)(10) is

> drawn in somewhat more general terms than the exemptive provisions incorporated in Section 393 of Chapter XI, because they would be applicable to a wide range of proceedings under various Federal or State laws.  But they apply essentially the same standards, in substantially the same language as Section 393. ...  We, therefore, regard Section 393 of the Bankruptcy Act as a specific application of the previously enacted Securities Act exemptions to the Chapter XI context, and conclude that, in Chapter XI proceedings, corresponding Securities Act exemptions must be construed to conform to the more specific terms of Section 393.

---

[10] A 1962 amendment to § 393 deleted the words "securities of or".  Pub.L. No. 87-681, § 16, 76 Stat. 570 (1962).  A Chapter XI arrangement could not affect the rights of equity holders and these words, copied from § 264, had never been of any effect.

*Sequential Info. Sys., Inc.*, SEC No-Action Letter, 1972 WL 10826, at *10 (Dec. 4, 1972).

Notwithstanding the foregoing, in a later no-action letter, the staff stated that § 3(a)(10) was "superseded by Section 393 in a Chapter XI context." *Data Graph, Inc.*, SEC No-Action Letter, 1973 WL 10386, at *5 (Oct. 26, 1973). A year later, in *O'Neill Bondholders Committee*, the SEC staff extended this position. There, a bondholders committee proposed to form a new corporation that would issue *its own* securities to bondholders to be secured by property acquired from the debtor. Its counsel opined that § 3(a)(10) could be applied to securities issued by a Chapter XI committee, even though § 393 would not apply by its own terms. The SEC staff rejected this position, finding "no authority for the proposition that a Bankruptcy Court can pass upon the fairness of the issuance of securities of a non-bankrupt in exchange for outstanding claims of a Bankrupt" and that "[i]n the Division's opinion, Section 3(a)(10) of the Securities Act of 1933 has no applicability in proceedings under Chapters X and XI of the Bankruptcy Act [which] are adapted to the particular proceedings specified in these Chapters." SEC No-Action Letter, 1974 WL 10005 (June 18, 1974). Evidently exasperated by the issuer's request for reconsideration, the staff restated the conclusion in jurisdictional terms in a subsequent letter and said: "a court can act judicially only within its sphere of jurisdiction, and we remain of the view that a court of bankruptcy lacks jurisdiction to pass upon the terms and conditions upon which securities are to be issued by a purchaser at a bankruptcy sale. Consequently, it is our view that an order by a bankruptcy court cannot meet the requirements of Section 3(a)(10)." SEC No-Action Letter, 1974 WL 9990 (Aug. 9, 1974).

There is no indication that any court gave substantive consideration to the

relationship between § 3(a)(10) and the Chapter X or Chapter XI exemptions, although

the Court in *SEC v. Century Inv. Transfer Corp.*, 1971 WL 297, at *7 (S.D.N.Y. Nov. 17,

1971), simply equated the exemptions under § 3(a)(10) and § 393 of Chapter XI.   At the

time of the adoption of a comprehensive new bankruptcy law in the 1970's, one

commentator argued that the procedures for SEC and court review of proposed plans in

Chapter X easily satisfied the "fairness hearing" requirement of § 3(a)(10), but that a lack

of prior disclosure and the amount of judicial review required in Chapter XI might not be

have been adequate.   Kahle, *The Issuance of Securities in Reorganizations and*

*Arrangements under the Bankruptcy Act and the Proposed Bankruptcy Act*, 36 Ohio St.

L.J. 380, 409-12 (1975) (hereafter "Kahle").[11]  In any event, when Chapters X and XI

were merged in 1978 in new Chapter 11, Congress amended the requirements for

confirmation of a Chapter 11 case.  It required substantial disclosure before a Chapter 11

plan could be voted on or confirmed.  11 U.S.C. § 1125, 1126.  It set forth detailed

provisions for confirmation of a plan with the consent of all impaired classes, and for the

application of a "fair and equitable" requirement in the context of a "cramdown."  11

U.S.C. § 1129.  It also adopted § 1145 of the Bankruptcy Code, a comprehensive

exemption from the securities laws for securities issued in connection with a Chapter 11

plan.  11 U.S.C. § 1145.[12]  Further, it made these amendments in light of an amendment

to § 3(a)(10), that, as mentioned above, added the initial clause, "Except with respect to a

---

[11] Proposed new Chapter 11 was under active consideration at the time this article was written, and the
author suggested that the new disclosure provisions might provide an adequate substitute for the Chapter X
procedures -- procedures that were eventually discarded.  *Id*. at 416-20.
[12] There is an exception in § 1145 for securities issued to an "underwriter" as defined in § 1145(b).

security exchanged in a case under Title 11 …" Pub. L. 95-598, Act of Nov. 6, 1978, §
306(b), 92 Stat. 2549.

### B.  Jurisdiction to Hold a § 3(a)(10) Hearing

In light of the language and history of § 3(a)(10), the first question to consider in
connection with the District Court's remand is whether this Court or the Court in
Argentina with jurisdiction over the APE would have jurisdiction to hold a fairness
hearing pursuant to that section.  The statute contemplates "a hearing upon the fairness"
of the terms and conditions of an exchange, held "by any court, or by an official or
agency of the United States, or by any State or Territorial banking or insurance
commission or other governmental authority expressly authorized by law to grant such
approval."   The District Court in its opinion quoted Loss & Seligman, *supra*, § 3-C-3(a),
for the proposition that the statute contains separate requirements for court approval,
federal approval, and approval by a State or Territorial authority, and that only the latter
is required to have "express authority to grant" the requisite approval.  *Multicanal III*,
331 B.R. at 549 n.3.  The Securities and Exchange Commission Division of Corporation
Finance, in a comprehensive *Revised Staff Legal Bulletin No. 3 (CF)*, at 1-2 (Oct. 20,
1999) construing the requirements of § 3(a)(10), has also concluded that only a
governmental entity need be "expressly authorized" to hold the hearing.

Nevertheless, it is patent that § 3(a)(10) "is not a jurisdictional or procedural
statute" and does "not provide a mechanism for obtaining a fairness hearing," and that the
authority "for the hearing must come from elsewhere." *Cont'l Assurance Co. v.
Macleod-Stedman, Inc.*, 694 F.Supp. 449, 467 (N.D. Ill. 1988).  In that case, the Court
held that it had jurisdiction to conduct a fairness hearing based on its jurisdiction to issue

14

a declaratory judgment on the fairness of a proposed settlement.  In the other leading case

on the standards for a finding of fairness under § 3(a)(10), *SEC v. Blinder Robinson &*

*Co., Inc.*, 511 F. Supp. 799 (D. Colo. 1981), the Court's authority derived from its

jurisdiction over the settlement of an SEC enforcement proceeding.  Courts have

conducted § 3(a)(10) hearings in many similar contexts.  See Ash, *Reorganizations and*

*Other Exchanges Under Section 3(a)(10) of the Securities Act of 1933*, 75 NW. U. L.

Rev. 1, 14 (1980) (hereinafter "Ash").

In this case, this Court's authority to hold a fairness hearing would derive from its

express authority under § 304(b)(3) to "order other appropriate relief," in connection with

the recognition of a foreign insolvency proceeding under § 304.  See *In re Gee*, 53 B.R.

891, 896-97 (Bankr. S.D.N.Y. 1985); *In re Rosacometta S.R.L.*, 336 B.R. 557, 561

(Bankr. S.D. Fla. 2005).  This grant of authority is broad enough to include a finding of

fairness under § 3(a)(10).  Huff contends that this Court would not have jurisdiction to

hold a fairness hearing because it does not have explicit power under § 304 to "approve"

the terms and conditions of the APE.[13]  Yet § 3(a)(10) does not require that a court be

expressly authorized to approve the terms and conditions of the underlying reorganization

plan.  The statute requires that the terms and conditions of the *exchange* be approved

"after a hearing upon the fairness of such terms and conditions…." (emphasis added).[14]

---

[13] Although it reserved its position on jurisdiction, Huff stated that it would readily participate in a "fairness hearing" before this Court, and indeed it has been adamant in seeking a forum at which it asserts it can establish the "unfairness" of the APE. Multicanal has taken the position that (i) if a jurisdictional issue does exist, it is a non-waivable subject matter defect, but that (as further discussed below) it does not believe an additional § 3(a)(10) hearing is needed because one has already been held.  See Letter dated Jan. 30, 2006.  Notwithstanding this response, if (as Multicanal asserts) an effective fairness hearing has already been held, it seems reasonable to conclude that, in order to have effect, it must have been held by a court with jurisdiction over the subject matter of the hearing.

[14] Recognition of a foreign insolvency proceeding under § 304 is also tantamount to "approval."  Section 304 is premised on the grant of comity to a foreign proceeding.  *In re Treco*, 240 F.3d 148, 156 (2d Cir. 2001).  Comity, in turn, rests generally on "approval" of a foreign judicial proceeding.  See *In re Culmer,*

There is no sound reason why a bankruptcy court should not be able to hold a fairness hearing under § 3(a)(10). As discussed above, the term "any court" in § 3(a)(10) derives from § 4(3) of the Securities Act of 1933, which expressly included a reorganization court. The provisions that had been in § 4(3) of the Securities Act relating to exemptions for securities issued in connection with a reorganization were subsequently split off from § 3(a)(10) and included first in § 77B(h) of the Act of 1934 and later in §§ 264 and 393 of the Chandler Act of 1938. Yet § 3(a)(10) coexisted for many years with §§ 264 and 393 of the Bankruptcy Act without any suggestion that the provisions of the statutes were mutually exclusive. The conclusion of most commentators, as discussed above, was that the provisions of §§ 3(a)(10), 264 and 393 were "cumulative" and that a finding by a reorganization court that a plan was "fair and equitable" under Chapter X or "in the best interests of creditors" under Chapter XI was the equivalent to a finding of "fairness" for purposes of § 3(a)(10). In its second letter in the *O'Neill Corporation* inquiry, the SEC took the position that a Chapter XI judge or referee did not have jurisdiction to hold a fairness hearing under § 3(a)(10), but there the proposed issuance of securities by a committee of bondholders was unquestionably outside the purview of § 393. That single no-action letter cannot be viewed as good authority for the proposition that a bankruptcy court would not have jurisdiction to hold a § 3(a)(10) hearing in connection with a § 304 ancillary proceeding.[15]

---

25 B.R. 621, 629 (Bankr. S.D.N.Y. 1982), citing *Cornfeld v. Investors Overseas Servs., Ltd.*, 471 F. Supp. 1255 (S.D.N.Y. 1979), *aff'd* 614 F.2d 1286 (2d Cir. 1979) ("[F]oreign-based rights should be enforced unless the judicial enforcement of such [rights] would be the *approval* of a transaction which is inherently vicious, wicked or immoral, and shocking to the prevailing moral sense.") (emphasis added).

[15] Nor is a similar statement in Saggese and Ranney-Marinelli, *A Practical Guide to Out-of-Court Restructurings*, §1.02[C] at 1-23 (2d ed. 1993); there is no citation to any authority. In Kahle, the author criticizes the SEC's jurisdictional conclusion in *O'Neill*, stating, "the SEC's ultra vires doctrine cannot possibly be founded on any notion of judicial competence since the same court which supervises the issuance of securities in Chapter X (usually assisted by the SEC) and Chapter XI (usually unassisted by the

As discussed above, as part of the adoption of the Bankruptcy Code in 1978, Congress amended § 3(a)(10) to exclude from its purview "a security exchanged in a case under Title 11." But no party to these proceedings has argued that that clause would apply in this case. The securities to be issued by Multicanal are to be exchanged in connection with the APE in Argentina. These securities are not being exchanged "in a case under Title 11;" if they were, they would *prima facie* be entitled to the exemption in § 1145 of the Bankruptcy Code.[16] There is no sound reason why a foreign representative should not be entitled to seek a § 3(a)(10) fairness hearing in connection with an ancillary petition, and every reason why this relief should be available. As discussed in *Multicanal II*, 314 B.R. at 517-19, the requirements of the United States securities laws may conflict with good faith efforts to restructure a foreign enterprise, leading in some cases (such as this one) to the conclusion that U.S. creditors who are not QIBs or accredited investors have to be treated differently from all others because of the requirements of our securities laws. The availability of a § 3(a)(10) fairness hearing in connection with a § 304 proceeding would facilitate such restructurings while still retaining adequate protection for U.S. investors, consistent with the purposes of § 3(a)(10) and the goal of § 304 to

---

SEC) would supervise their issuance in straight bankruptcy. Indeed, the SEC has recognized that state court judges (who may be totally unfamiliar with the federal securities laws) can conduct the fairness hearing." 36 Ohio St. L.J. at 410-11 (footnote omitted). See also Note, *Effect of Section 3(a)(10) of the Securities Act as a Source of Exemption for Securities Issued in Reorganizations*, 45 Yale L.J. 1050, 1056-58 (1936) (suggesting that courts with jurisdiction over equity receiverships would have jurisdiction to make a § 3(a)(10) fairness determination).

[16] It has been stated that 11 U.S.C. § 1145 is the only available securities law exemption where securities are issued in a case under the Bankruptcy Code, in light of the express exclusion in § 3(a)(10). See 8 *Collier on Bankruptcy* ¶ 1145.01[2] n.20 (15th ed. 2005). The converse, that a bankruptcy court could not hold a § 3(a)(10) fairness hearing, does not necessarily follow. Even if a § 304 case arises "under" title 11, it is a special ancillary proceeding, as opposed to a "full-fledged bankruptcy case," and does not create a bankruptcy estate. *Bondi v. Grant Thornton Int'l*, 322 B.R. 44, 48 (S.D.N.Y. 2005); *Culmer*, 25 B.R. at 633. The securities here are not being "exchanged in" a title 11 case.

provide a mechanism "to best assure an economical and expeditious administration" of the foreign estate.[17]

The jurisdiction of this Court to hold a fairness hearing for purposes of § 3(a)(10) does not, however, mean that the courts in Argentina would lack such jurisdiction.  As the District Court noted in *Multicanal III*, 331 B.R. at 549, there are few cases construing § 3(a)(10), and none where a fairness hearing has been held by a foreign court, but the SEC staff has taken the position in numerous no-action letters that the phrase "any court" includes a foreign court, and that foreign courts can hold fairness hearings that satisfy the conditions of § 3(a)(10).   See, e.g., *AngloGold Ltd.*, SEC No-Action Letter, 2003-2004 Fed. Sec. L. Rep. (CCH) ¶ 78,641 (Jan. 15, 2004) (High Court of Ghana); *Canadian Pac. Ltd.*, SEC No-Action Letter, 2001 Fed. Sec. L. Rep. (CCH) ¶ 78,146 (Aug. 15, 2001) (Alberta Queen's Bench); *Industrial Commercial Dev. Ltd.*, SEC No-Action Letter, 2000 Fed. Sec. L. Rep. (CCH) ¶ 77,823 (Feb. 24, 2000) (Jamaica); *Ashanti Goldfields Co. Ltd.*, SEC No-Action Letter, 2002 WL 1359408 (June 19, 2002) (Grand Court of the Cayman Islands); *Exel Ltd.; Mid Ocean Ltd.; Exel Merger Co. Ltd.*, SEC No-Action Letter, 1998 WL 384578 (July 2, 1998) (Grand Court of the Cayman Islands); *3-D Systems Inc.*, SEC No-Action Letter, 1993 WL 138734 (April 26, 1993) (Supreme Court of British Columbia); see also Loss & Seligman, *supra,* § 3- C-3(a) n.135 ("A foreign court may conduct the § 3(a)(10) fairness hearing.").

---

[17] The 2005 Amendments to the Bankruptcy Code repealed § 304 for cases filed on and after October 17, 2005 and replaced it with the provisions of Chapter 15.  Under Chapter 15, upon recognizing a foreign main proceeding, a bankruptcy court can (with some specific exceptions not applicable here) grant "any appropriate relief," as well as "additional assistance to a foreign representative under this title or under other laws of the United States."  11 U.S.C. §§ 1521(a), 1507(a).  The Court's authority to make a § 3(a)(10) finding of fairness is even clearer under Chapter 15.

Huff argues that the phrase "any court" can only mean a domestic court, citing

*Small v. United States*, 125 S. Ct. 1752, 1754, 1758 (2005), a criminal case in which the

Supreme Court construed the phrase "any court" to mean a domestic court.  However, the

Supreme Court made it clear in *Small* that the "assumption" that "any court" means a

domestic court could be overcome by "statutory language, context, history and purpose."

125 S.Ct. at 1756.  All point against a construction of § 3(a)(10) that would automatically

exclude foreign courts from holding a fairness hearing.  Section 3(a)(10) itself provides

for approval by "any court" or "any official or agency of the United States" or by "any

State or Territorial banking or insurance commission."  Congress knew how to restrict

authority to hold a hearing to domestic officials and agencies when it wanted to do so.

Cf. *Duncan v. Walker*, 533 U.S. 167, 173 (2001).  Moreover, the argument cannot be

made that § 3(a)(10) is limited to the exchange of domestic securities or that the statute

does not apply to the foreign issue of securities.  The position of the SEC throughout the

history of § 3(a)(10) is also that foreign courts are included in the term, "any court."

There may be reasons why a foreign court may decline to hold a fairness hearing required

under § 3(a)(10), including the reluctance of courts in some civil law jurisdictions to take

action that is not expressly authorized by the statutes over which they preside.  Cf. *In re

Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 658 (Bankr. D. Del. 2003), *aff'd*,

308 B.R. 672 (D. Del. 2004).  But no cogent reason has been suggested why a foreign

court should not, in principle, have jurisdiction to hold a § 3(a)(10) fairness hearing.[18]

---

[18] The requirements of the U.S. securities laws can be particularly burdensome where securities were originally issued in an offshore transaction but where a small part of the issue was thereafter purchased by U.S. holders and held by U.S. persons at the time of the reorganization and proposed exchange.  It would be particularly unfair to exclude such holders from an exchange transaction, as Multicanal believed was necessary in this case, if the foreign court could hold a § 3(a)(10) fairness hearing and make the findings required.

### C.  The Requirements of § 3(a)(10)

Multicanal's position is that an effective fairness hearing *has already* been held. This requires, first, an analysis of what is required for a finding of fairness under § 3(a)(10), and second, consideration of the record in this matter.

The most authoritative description of the requirements of § 3(a)(10) is contained in the Revised Staff Bulletin No. 3, mentioned above.  The District Court found that this Bulletin provides guidance based on the SEC's expertise in the field and should be considered.  *Multicanal III*, 331 B.R. at 550, citing *Gryl ex rel. Shire Pharm. Group PLC v. Shire Pharm.*, 298 F.3d 136 (2d Cir. 2002).  Revised Staff Bulletin No. 3 finds that eight conditions must be satisfied in connection with the § 3(a)(10) exemption.

These factors can be divided into two categories.  One category involves those factors that concern adequate notice of the hearing and an opportunity to be heard in an appropriate forum.  The second category speaks to the issue of substantive fairness and the standards that should govern its determination.  Each category will be analyzed in turn.

### 1.  Notice and Due Process Considerations

Several of the factors listed by the SEC in Revised Staff Bulletin No. 3 involve notice and due process considerations.  Thus the court or authorized governmental authority must hold a hearing before approving the fairness of the transaction; the fairness hearing must be open to everyone to whom the securities would be issued in the proposed exchange; adequate notice must be given to all these persons; there cannot be any improper impediments to the appearance by these persons at the hearing; and the court or governmental authority must be advised before the hearing that the issuer will

20

rely on the §3(a)(10) exemption in seeking a finding of fairness.  SEC Revised Staff

Bulletin No. 3 (factors 3(b), 4, 6, 7, 8).

      The record to date is as follows with respect to satisfaction of these conditions.

Hearings were held in Argentina and in the United States that were on notice to all

interested persons.  This Court previously found that "in the Multicanal APE

proceedings, notice was extensive and highly sophisticated" and that as a reporting

company, Multicanal "was required to continue to provide filings on Form 6-K, and

financial information on Multicanal was available to creditors and others through SEC

filings ….  Adequacy of notice is one of the few matters that Huff does not challenge."

*Multicanal II*, 314 B.R. at 510.   On the other hand, as the District Court recognized,

"[c]learly, the Argentine court was not advised beforehand that Multicanal intended to

rely on the section 3(a)(10) exemption," citing the *AngloGold Ltd.*  No-Action letter,

where the Ghanaian court was advised that its sanctioning of a scheme of arrangement

would also constitute the basis for the issuance of the AngloGold Shares under the

scheme without registration under the Securities Act, in reliance on the exemption from

registration provided by § 3(a)(10).  *Multicanal III*, 331 B.R. at 550-51.   This Court also

had no notice that Multicanal might rely on a § 3(a)(10) exemption and in fact assumed

that the exemption would not be available.  *Multicanal II*, 314 B.R. at 518, n.20.

      Multicanal argues that failure to give prior notice that the exemption under §

3(a)(10) would be one of the issues to be dealt with in the extensive hearings was a

ministerial matter and did not infringe on any substantive rights, negating the need for

strict adherence to Factor 4 of the Staff Bulletin, which requires prior notice.  The

hearing, however, must take place pursuant to the statute, not just pursuant to Revised

21

Staff Bulletin No. 3.  Factor 4 derives directly from the language of § 3(a)(10), which

calls for approval of the terms and conditions of the issuance and exchange of securities,

"after a hearing upon the fairness of such terms and conditions."  The statute implies the

need for a hearing with prior notice that fairness within the meaning of § 3(a)(10) will be

considered.  This is the conclusion of the only reported decision on the subject, which

held that a proceeding cannot be turned into a § 3(a)(10) fairness hearing without prior

notice.  *Merger Mines Corp. v. Grismer*, 137 F.2d 335, 341 (9th Cir. 1943), *cert. denied*,

320 U.S. 794 (1943).  In this case, neither the courts nor the affected parties viewed the §

304 proceeding or the Argentine hearings as a §3(a)(10) hearing on the "fairness" of the

transaction, and they cannot be retroactively reconstituted as such at this time.

## 2.  Finding of Substantive Fairness

The remaining factors set forth in Revised Staff Bulletin No. 3 contain what might

be called substantive conditions.

Factor 1, which analyzes the types of exchanges that can be the subject of a §

3(a)(10) exemption, was clearly fulfilled.  As the SEC has found in no-action letters, §

3(a)(10) encompasses exchanges involving common stock, preferred stock, debt

securities and beneficial interests in a trust.  See *Borland Int'l, Inc.*, SEC No-Action

Letter, 1987 WL 108550 (Oct. 28, 1987) (common stock); *First N.H. Banks, Inc.*, SEC

No-Action Letter, 1985 WL 53942 (March 7, 1985) (preferred stock).  There is no

question that Multicanal's proposed cure exchanges securities for existing debt.

Factor 2 requires a court to "approve" the fairness of the exchange, and factor 3(a)

mandates that the court must find the terms and conditions of the exchange "fair" to those

to whom securities will be issued.  As discussed below, no court has yet found that the

terms and conditions of the APE exchange are fair to those to whom securities will be
issued.

Very few cases actually have examined the concept of fairness as used in §
3(a)(10).  The only two reported cases that have subjected the provision to substantive
analysis on this issue are *SEC v. Blinder Robinson & Co., Inc.*, 511 F.Supp. at 801, and
*Cont'l Assurance Co. v. Macleod-Stedman, Inc.*, 694 F.Supp. at 468.[19]

In *Blinder Robinson*, the SEC had brought a civil enforcement proceeding
charging the defendants with violation of the Securities Act of 1933 and the Securities
Exchange Act of 1934 in connection with a public offering of securities.  The SEC
thereafter entered into a settlement pursuant to which existing and former shareholders
proposed to exchange their outstanding securities for new shares of common stock and
promissory notes, and the parties to the settlement conducted a fairness hearing in
connection with the District Court's approval of the settlement.  511 F. Supp. at 800-01.
The court held that the issue for decision under § 3(a)(10) was fairness of process and fair
dealing, based on (i) the recommendations of counsel; (ii) the scope of the record as an
indication of the adequacy of the investigation into the facts; (iii) the apparent
alternatives to settlement; (iv) the nature and volume of responses from those receiving
notice of the hearing; and (v) the opportunity for direct participation in the process of
obtaining full disclosure.  *Id*. at 801.  The court concluded that the securities issued under
the settlement were exempt from registration under § 3(a)(10) because the fairness
hearing was the "functional equivalent" of the disclosure required under the 1933 Act.

---

[19]  Several cases discuss the statute and hold that an exchange solely for cash does not satisfy the
requirements of § 3(a)(10).  See *SEC v. Century Inv. Transfer Corp.*, 1971 WL 297, at *7 (S.D.N.Y. Nov.
17, 1971); *SEC v. Granco Prods., Inc.*, 236 F. Supp. 968, 971 (S.D.N.Y. 1964); *SEC v. Philip S. Budin &
Co., Inc.*, 1971 WL 272, at *2 (D.N.J. May 3, 1971).

*Id*. at 802.  Significantly, the court "made no attempt to determine value, now or in the future," giving two reasons for this conclusion.  First, it said it did not have to confront "the adequacy of relief obtained by comparing the value of the securities to be issued with the claims of loss, as would be true in the settlement of a class action or a derivative action by shareholders under Rules 23(e) and 23.1 of the Federal Rules of Civil Procedure."  *Id*. at 801.  Second, the court found that this was "a situation in which the value of the stock and notes to be issued must be considered speculative because the underlying business [was] in a developmental stage."  *Id*.

While accepting the *Blinder Robinson* conclusions relating to fairness of process and fair dealing, the court in *Cont'l Assurance Co. v. Macleod-Stedman, Inc.* refused to follow it in its disregard of value as an element of fairness.  694 F. Supp. at 468.  The plaintiff there sought a declaratory judgment that a settlement proposed by a Canadian issuer of defaulted mortgage notes was fair and exempt from registration pursuant to § 3(a)(10).  The court examined the liquidation value of the business before and after the proposed settlement, the alternatives to the settlement, and the value of the securities to be exchanged, and concluded that the settlement was of fair value and reached after fair dealing.  *Id*. at 468.  The court found that a hearing that "involves a consideration of the value of the settlement compared to the possible results of litigation" is a more consistent reading of the plain language of § 3(a)(10) and its purposes.  694 F. Supp. at 468, citing Hicks, 7 *Exempted Transactions Under the Securities Act of 1933*, § 3.02[4][b]-[c] (1984).  In reaching this conclusion, the court also relied on *Brucker v. Thyssen-Bornemisza Europe N.V.*, 424 F.Supp. 679, 687-88, *aff'd sub nom., Brucker v. Indian Head, Inc.*, 559 F.2d 1202 (2d Cir. 1977), *cert. denied*, 434 U.S. 897 (1977), where, in

determining the "fairness" of the settlement of a class action, the court had considered the

value of the settlement by comparing the settlement with the risks and likelihood of

recovery if litigation were pursued.

The SEC has frequently taken the position that a court must consider value in

rendering a fairness decision.  Its Revised Staff Bulletin No. 3 at Heading 4, ¶ B(3) states,

"It is the Division's view that the reviewing court or authorized governmental entity

making the fairness determination 'must have sufficient information before it to

determine the value of both the securities, claims or interests to be surrendered and the

securities to be issued in the proposed transaction,'" quoting its own Task Force Report at

p. 60 and citing *Information Resources, Inc.*, SEC No-Action Letter, 1995 WL 82767

(February 27, 1995), *Applied Magnetics Corp.*, SEC No-Action Letter, 1995 WL 324752

(May 30, 1995), and *Gensia Inc.*, SEC No-Action Letter, 1995 WL 377175 (June 23,

1995).  Courts have also given meaning to the concept of "fairness" in other contexts by

examining value.  For example, in connection with mergers and offers to purchase stock,

fairness rests on the "available and reliable" market value of the stock because it takes

into account asset value and other economic, political and financial factors.  See *Seabord*

*World Airlines, Inc. v. Tiger Int'l, Inc.*, 600 F.2d 355, 361 (2d Cir. 1979); *Mills v. Elec.*

*Auto-Lite Co.*, 552 F.2d 1239, 1247 (7th Cir. 1977), *cert. denied*, 434 U.S. 922 (1977).

Cases that consider the issue of "fairness" in connection with a settlement routinely

examine the values at issue.  See, e.g., *Newman v. Stein*, 464 F.2d 689, 691-92 (2d Cir.

1972); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). [20]

---

[20] Value also has been examined as an element of fairness under the Blue Sky laws of those states that have
granted administrators the authority to hold § 3(a)(10) fairness hearings.  See e.g., ANN. CAL. CORP.
CODE § 25142 (West 2006); N.C. GEN. STATUTES ANN. § 78A-30 (West 2006); OHIO REV. CODE
ANN. § 1707.04 (Baldwin 2006); OR. REV. STATUTES ANN. § 59.095 (West 2006).  Commentators

Based on the language and history of § 3(a)(10), it is clear that Congress required
more than procedural fairness and full disclosure when it mandated that there be a
hearing upon the fairness of the transaction.  As the court noted in *Cont'l Assurance*,
"Section 3(a)(10) was intended primarily to offer financially troubled corporations an
alternative to the burdens of registration," a goal inconsistent with the construction of §
3(a)(10) as only a disclosure statute.  See also SEC Securities Act Release No. 33-312,
1935 WL 29346 (March 15, 1935), in which the SEC stated that the "whole justification"
for § 3(a)(10) was that "the examination and approval by the body in question of the
fairness of the issue in question is a substitute for the protection afforded to the investor
by the information which would otherwise be made available to him through
registration."

On the other hand, although a reviewing court would need to have information on
value, the *Blinder Robinson* court was correct in noting that value in the context of a
business undergoing reorganization is often speculative.  In determining fairness under §
3(a)(10), it would be wrong to require a full valuation hearing of the type that used to be
held in Chapter X and that Congress rejected when it adopted the 1978 Code.  Under the
Bankruptcy Code, old Chapters X and XI were merged in new Chapter 11, Congress
eliminated any need for a full valuation hearing, and it mandated additional disclosure in
Chapter 11 through the requirement that a disclosure statement be disseminated before
any creditor vote.  See 11 U.S.C. § 1125; H.R. Rep. No. 95-595, 95th Cong., 1st Sess.

---

agree that courts should look at the use of "fairness" in other contexts in order to make a determination to
approve the fairness of a transaction under § 3(a)(10).  Ash at 18 n.104; Comment, *Fairness Requirement
in Section 3(a)(10) of the Securities Act of 1933*, 23 Wm. & Mary L. Rev. 549, 555-56 (1982).

226 (1977).[21]  In addition to full disclosure, all Chapter 11 plans must also meet the requirements of § 1129 of the Bankruptcy Code, including a showing of good faith and satisfaction of the "best interest of creditors" test, which ensures that creditors receive an amount that is at least equal in value to what they would have received in a Chapter 7 liquidation.  See Senate Report No. 95-989, 95th Cong., 2d Sess. 126 (1978).  Congress obviously concluded that satisfaction of these conditions provided appropriate investor protection in the context of a Chapter 11 reorganization, as it also included a broad exemption from the registration requirements of the securities laws for securities issued in a Chapter 11 case.  Although it is premature to set forth the precise contours of the grounds on which a finding of fairness could be made in this case, the factors that justify confirmation of a plan under Chapter 11 of the Bankruptcy Code ought, in principle, to be adequate to support a finding of fairness under § 3(a)(10).

### D.  A Fairness Hearing Has Not Yet Been Held

The final question is whether Multicanal is correct in its assertion that a fairness hearing *has already* been held.  It contends that the action of the courts in Argentina in approving the APE and the action of this court, affirmed by the District Court, in conditionally finding that the APE meets the standards of § 304, both constitute a "hearing upon the fairness" of the terms and conditions of the exchange.  Huff argues that neither the Argentine nor the United States courts considered the "fairness" of the APE and that they certainly did not do so with a view toward the application of § 3(a)(10).

---

[21] The House Report stated:

> If adequate disclosure is provided to all creditors and stock holders whose rights are to be affected, then they should be able to make an informed judgment of their own rather than having a court or the Securities and Exchange Commission inform them in advance whether the proposed plan is a good plan.  Therefore, the key to the consolidated chapter is the disclosure section.

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 226 (1977).

The record is clear that neither the Court in Argentina nor this Court has expressly found that the Multicanal APE was fair, within with meaning of § 3(a)(10) and assuming *arguendo* that it would be possible to do so without prior notice that the court would be making a fairness determination.   The scope of the authority of the Argentine court was limited with respect to its review of the terms and conditions of the APE.  The only issues it had authority to consider in approving the APE were whether assets and liabilities were properly stated, whether the APE had been approved by the necessary supermajority of creditors, and whether the APE was abusive or fraudulent.  *Multicanal II*, 314 B.R. at 504-10.  Huff objected to this Court's recognition of the APE under § 304 on the ground that the scope of judicial control in Argentina was so limited, and it further argued that this Court should not have granted relief under § 304 because the APE failed to meet the standards for confirmation of a plan of reorganization under Chapter 11.  The Court in its prior opinion rejected Huff's ultimate conclusion (that recognition should be refused), but the result rested in part on the holding that "[t]here is no requirement that a foreign proceeding incorporate the conditions to confirmation set forth in § 1129 of the U.S. Bankruptcy Code."  *Multicanal II*, 314 B.R. at 506.  No express finding was made, either by this Court or by the Court in Argentina, that the APE met even the "best interests of creditors" test.

This Court found, in its prior opinion, that there was nothing in the terms of the APE that was "fundamentally inconsistent with the provisions of a confirmable Chapter 11 plan," and it rejected Huff's multifarious claims that Multicanal had acted in bad faith and that the APE was patently a give-away for the benefit of its shareholder, Grupo Clarin.  *Id*. at 507-08.   It also observed that "[t]here is no question on the extensive

record of this case, however, that this cable company with few hard assets would have little to distribute in a liquidation." *Id*. at 507.  Nevertheless, the Court made these findings in the context of its recognition of the APE under § 304, and it never received evidence of the value to be received by creditors under the APE as compared to the value that could be recovered in a hypothetical liquidation.  The Court found in its prior opinion that an APE, like a U.S. prepackaged Chapter 11 case, presumes that a vote in favor by informed creditors provides a sufficient level of comfort that the transaction is not fundamentally unfair, but Chapter 11 also mandates (among other things) that there be proof of compliance with the best interests test, as well as an express finding of good faith.  *In re Best Prods. Co., Inc.*, 168 B.R. 35, 72 (Bankr. S.D.N.Y. 1994).  Although Multicanal is correct that the Court rejected Huff's claims that the Argentine proceedings were unfair, § 3(a)(10) requires a more explicit determination relative to fairness and to the value of the consideration to be received in the exchange.

While Multicanal cannot use § 3(a)(10) as an exemption from registration at this time, its ability to claim the § 3(a)(10) exemption is not foreclosed.  The District Court suggested that the Argentine court might be able to hold a fairness hearing and said, it "is even possible that the Bankruptcy Court might itself hold a fairness hearing, with requisite advance notice, and that such a hearing might qualify Multicanal for an exemption."  *Multicanal III*, 331 B.R. at 551.   It expressly stated, "To the extent the Bankruptcy Court determines that the requirements of section 3(a)(10) have been satisfied, and the informational packets to accompany the proposed exchange were satisfactory, then the cure would satisfy section 5 of the Securities Act, and the section 304 petition of Multicanal's Board of Directors could be granted."  *Id*.

The Court finds that the information disseminated to creditors was adequate to permit a vote on the APE but that the lack of notice that a fairness finding would be at issue, and a lack of a hearing open to all interested parties and findings on the issue of fairness, prevents a ruling that a fairness determination for purposes of § 3(a)(10) has already been made.

As noted above, the District Court also remanded the question whether "in light of the passage of time and changed economic circumstances, a re-vote of all noteholder creditors should be required." *Multicanal III*, 331 B.R. at 551. This issue could also be considered in connection with a fairness hearing.

## II. Rule 152 Safe Harbor

The second principal issue remanded by the District Court is whether there is an exemption for the securities to be issued by Multicanal pursuant to Rule 152 under the 1933 Act.

Section 5 of the Securities Act of 1933 prohibits the public offering and sale of securities before the issuer files a registration statement with the SEC and the registration statement becomes effective. Section 4(2) exempts transactions by an issuer "not involving any public offering." In 1935, the SEC adopted Rule 152, which in its present form reads as follows:

> The phrase transactions by an issuer not involving any public offering in section 4(2) shall be deemed to apply to transactions not involving any public offering at the time of said transactions although subsequently thereto the issuer decides to make a public offering and/or files a registration statement.

17 C.F.R. § 230.152. Rule 152 has been described as an exception to the SEC's "integration doctrine," which provides that an issuer cannot use two or more

exemptions to avoid registration of what is in reality a single transaction and determines what constitutes a single offering for purposes of registration. See Bradford, *Expanding the Non-Transactional Revolution: A New Approach to Sec. Registration Exemptions*, 49 Emory L.J. 437, 460 (2000); Hicks, *The Concept of Transaction as a Restraint on Resale Limitations*, 49 Ohio St. L.J. 417, 431 (1988); Johnson and Patterson, *The Reincarnation of Rule 152: False Hope on the Integration Front*, 46 Wash. & Lee L. Rev. 539, 549-56 (1989); Wade, *The Integration of Sec. Offerings: A Proposed Formula that Fosters the Policies of Sec. Regulation*, 25 Loy. U. Chi. L.J. 199 (1994).

Rule 152 has not been the subject of any substantive judicial analysis.[22] It was apparently not the subject of any SEC application either during its first fifty years when, in 1986, the staff issued a "no-action" letter that took the position that Rule 152 precluded integration of a successfully completed private placement and a later registered initial public offering. *Verticom, Inc.*, SEC No-Action Letter, 1986 WL 65214 (Feb. 12, 1986). Importantly, the staff held that the company did not have to rely on the traditional five-factor integration analysis that had been proffered by the issuer's counsel, and that it would issue a "no-action" letter based solely on Rule 152.[23] Since *Verticom*, the SEC staff has applied Rule 152 in

---

[22] It has apparently been mentioned in only one reported case, *Neuwirth Inv. Fund, Ltd. v. Swanton*, 422 F. Supp. 1187, 1196 (S.D.N.Y. 1975), where the court noted simply that the Rule provides that later registration of a public offering does not affect the nonpublic nature of the original sale.

[23] This is the integration analysis that the District Court applied in *Multicanal III* to find that Multicanal's solicitation of votes prior to the meeting of December 10, 2003 at which the APE was approved was not "separate and distinct" from the exchange of securities to be offered to retail holders in connection with the cure required to obtain § 304 relief. The five factors, as described by the District Court, are the following: (i) whether the offerings are part of a single plan of financing; (ii) whether the offerings involve issuance of the same class of security; (iii) whether the offerings are made at or about the same time; (iv) whether the same type of consideration is to be received; and (v) whether the offerings are made for the same general purpose. *Multicanal III*, 331 B.R. at 547-48.

several no-action letters or interpretations.  *Black Box Inc.* involved a

comprehensive recapitalization of a financially troubled company, which

proposed to issue convertible debentures to a limited number of QIBs in a private

placement and then to proceed with a planned public offering of common stock.

The staff determined that, based on Rule 152, "the private placement need not be

integrated with the later public common stock offering, based particularly on "the

representation that the purchasers of the Convertible Debentures will be obligated

to purchase such securities subject only to satisfaction of specified conditions

which will not be within the control of the purchasers."  *Black Box Inc.*, SEC No-

Action Letter, 1990 WL 286633 (June 26, 1990).

        In an interpretive letter, the staff subsequently confirmed that its position

on Rule 152 was not limited to troubled companies, but that it "was simply a

formal articulation of an informal position the staff has taken previously with

respect to simultaneous registered offerings and unregistered offerings to a limited

number of first-tier institutional investors in connection with structured

financings."  The staff noted that as a "policy position, it is narrowly construed by

the staff … limited in applicability to situations where a registered offering would

otherwise be integrated with an unregistered offering to 1) persons who would be

qualified institutional buyers for purposes of Rule 144A and 2) no more than two

or three large institutional accredited investors."  *Squadron, Ellenoff, Plesent &*

*Lehrer*, SEC Interpretive Letter, 1992 WL 55818 (Feb. 28, 1992).  It also

confirmed that the result would not have been different if the same securities had

been issued in the private offering and the subsequent registered offering.

Multicanal argues from the foregoing that its private placement to the U.S. QIBs was complete in 2003 at the latest, when they became bound by their affirmative vote in favor of the APE, and that the offer and sale to these QIBS should not be integrated with the subsequent registration of the shares for the benefit of U.S. retail holders (as a result of the decision of the U.S. courts) or for the holders who had voted "no" or abstained (as a result of the requirement of the Argentine courts that these holders be given an election). Huff contends that the offering to QIBs is not complete even now, as the "yes" voters have the right to terminate the APE under certain circumstances, and the effectiveness of the entire offering is still uncertain in light of the status of the litigation in our courts and in Argentina.[24] Huff also argues that the Rule 152 exemption "is applicable only to certain types of structured financings," citing a number of commentators. (Huff Br. 12/21/05 at 10-11); see Hazen, 1 *Law of Sec. Regulation* § 4.36 (5th ed. 2005) (The "protection provided by Rule 152 is quite narrow."); Loss & Seligman, *Sec. Regulation* (3d ed. 1989) (referring to Rule 152 as a "narrow safe harbor to raise 'seed money' for organizational expenses"); 14 Lander, *U.S. Sec. Law for Intl. Fin. Trans. and Capital Mkts.* § 5:42 (2d ed. 2005) (the Securities Act "does not permit a transaction commenced as a private placement to be completed as a registered offering of those same securities to the same investors").

Although the line of no-action letters under Rule 152 is extensive, the SEC staff has never applied Rule 152 in a case that resembles the one at bar. Multicanal either did not request a no-action letter from the SEC relating to the Rule 152 issue, or one was not

---

[24] The record is not entirely clear whether the approval of the APE given by the Argentine Commercial Court on May 16, 2005, rejecting Huff's most recent objections, constitutes final approval for purposes of Argentine law.

forthcoming.[25]  In the absence of action by the SEC construing its own rule and practice, or the issuance of a no-action letter with respect to Multicanal's proposed exchange, it is impossible to conclude that Rule 152 provides a clear exemption and a clear path to closure of the APE.

Rule 152 is not a model of clarity, especially in its use of the words "and/or" at the end of its one sentence.  As has been pointed out, it is susceptible to at least three constructions: (i) the private placement would not be integrated with a subsequent registered offering if the issuer decides after the private placement to make a public offering or file a registration statement (a subjective test); (ii) the private placement would not be so integrated if the issuer files a registration statement after the private placement (an objective test); or (iii) the private placement would not be so integrated if the issuer files a registration statement after the private placement covering securities that were offered but not sold in the private placement (the broadest construction).  Johnson and Patterson, *The Reincarnation of Rule 152: False Hope on the Integration Front*, 46 Wash. & Lee L. Rev. at 549-56.  The authors there recognized that the SEC staff has given Rule 152 the third and broadest possible interpretation but questioned whether the construction would be followed even by the full Commission, in light of its integration decisions at the time Rule 152 was adopted in the 1930's and Commission decisions thereafter.  46 Wash. & Lee L. Rev. at 572, citing *Unity Gold Corp.*, 3 S.E.C. 618, 624 (1938); and *Cameron Indus., Inc.*, 39 S.E.C. 540-41 (1959); see also *LaserFax, Inc.*, SEC No-Action Letter, 1985 WL 54332 (Aug. 15, 1985).

---

[25] The SEC staff has also apparently not declared the effectiveness of Multicanal's registration statement.

In any event, and without questioning the staff's long-standing construction of the SEC rule, Multicanal is arguing here for a construction of Rule 152 that would permit a subsequent registration and sale of securities to offerees who were solicited in the earlier private placement and rejected it. Multicanal is proposing to register not only the securities to be offered to U.S. retail holders, who were never offered a security in the earlier APE, but the securities to be issued to those who were already offered the same package but voted "no" or abstained.[26] It is proposing to do exactly what Lander, *supra*, says it cannot do: complete a private placement by offering the same securities to the same investors in a registered offering. See also Keller, *Current Issues in Private Placements: Private/Public Offerings*, 933 PLI/Corp 9, at *18 (April-May 1996). It is recognized that, in Multicanal's words, "this case is not typical." (Multicanal's Br. on Remand at 14 n.19.) However, a general rule that would permit an issuer to offer unregistered securities to certain holders of debt and then offer registered securities to those who did not accept the offer would go beyond the existing no-action letters and contravene a basic goal of the securities laws, which is to assure the widest availability of information to potential investors before they make an investment decision. Under the unusual facts at bar, it is recognized that Multicanal initially determined not to register any securities in its offering, but its change of mind creates classifications that are fundamentally at odds with the basic purposes of the integration doctrine.

It is also impossible to state with certainty that the "yes" voters are obligated to take the securities offered in the APE "subject only to satisfaction of specified conditions which will not be within the control of purchasers." *Black Box Inc.*, 1990 WL 286633, at

---

[26] As noted above, the courts in Argentina have required that Multicanal give these holders a choice among the options, and Multicanal is registering the shares that these holders will receive.

*15.  The APE can be terminated by the "yes" voters under certain circumstances, as

Huff argues, and it is not clear when it will become effective.

Moreover, Multicanal's registration of securities for the benefit of the "no" voters

and the U.S. retail holders creates its own form of reverse discrimination against the

"yes" voters of which these holders were unaware when they made their election under

the APE.  There is no dispute that a security registered under the U.S. securities laws is

generally more valuable, to a U.S. person, than an unregistered security.  Yet the "yes"

voters now end up with an unregistered security, while all others have the benefit of a

security that is registered.

Multicanal argues that SEC Rule 144(k) permits previously restricted securities

(such as the securities issued to the QIBs) to become available for public resale following

expiration of a two-year holding period, and that it is in "accordance with normal

industry practices" to remove restrictive legends on securities that may be sold pursuant

to Rule 144(k).  (Multicanal's Reply to Huff's Br. on Remand at 12, citing Telephone

Interpretation of Rule 144 No. 8, available at

http://www.sec.gov/interps/telephone/1997manual.txt. and *Mayfield III*, SEC No-Action

Letter, 1985 WL 54127, at *1 (Apr. 5, 1985).)  Multicanal further contends that the two-

year holding period for the "yes" voters has already run, on the theory that it began

running at the time of the vote in 2003 when the "yes" holders assumed the risk of

economic loss, "even though actual delivery of the securities may not occur until later."

*Id*. at 14, citing *Resales of Restricted and Other Sec.*, SEC Release No. 33-6099, 1979

WL 174360 at *9 (Aug. 2, 1979).  Further, Multicanal has drafted a resale registration

rights agreement for the benefit of the consenting holders, which would provide for

backstop resale shelf registration rights for consenting holders in the event that Rule

144(k) proved unavailable to assure equal treatment for the "yes" voters.

Notwithstanding all of Multicanal's efforts, there is no certainty that the holding

period has already run or that there would be no reverse discrimination against the

consenting holders.  There is authority that the holding period is tolled during the period

when any required governmental approval is obtained for the transaction, and that "the

SEC staff reasons that since the purchaser is unable 'to exercise shareholder rights with

respect to stock, such as voting rights, or the right to receive dividends, the holding

period does not commence until the contingency is removed.'"  Hicks, *Exempted*

*Transactions under the Securities Act of 1933*, § 10.111 (2d ed. 2005).   The shelf

registration proposed by Multicanal does not provide consenting holders with all of the

uncircumscribed rights of those who would receive registered securities under the F-4

Registration Statement.

In its decision rejecting Multicanal's reliance on an exemption under § 3(a)(9) of

the Securities Act, the District Court concluded that the safe harbor propounded by

Multicanal was not available.  It concluded: "There are simply too many tangled facts at

play for me to defer to the mere lapse of more than six months since the December 2003

vote of creditors, or otherwise to persuade me that the SEC would apply a six-month safe

harbor to the facts of this case.  Indeed, the SEC staff was unwilling to give Multicanal a

No-Action Letter because of material factual issues at play."  *Multicanal III*, 331 B.R. at

547.  Having found no safe harbor, the Court applied the "traditional five-factor test for

determining if multiple offerings are to be integrated" and found that the 2003 offer

would clearly be integrated with an offer of the same securities to retail holders in 2005

or later. *Id*. at 547.  The Court's findings were definitive with respect to integration.

Reviewing the five traditional factors set forth in SEC Release No. 33-4434, 1961 WL

61651 (Dec. 6, 1961); Release No. 33-4552, 1962 WL 69540 (Nov. 6, 1962); and Rule

502(a) of Regulation D, 17 C.F.R. § 230.502(a), the Court found that integration was

clearly indicated by four of them -- *i.e.*, whether the offerings are part of a single plan of

financing; whether they involve issuance of the same class of security; whether the same

type of consideration is to be received; and whether the offerings are made for the same

general purpose.  The only factor that was not easily satisfied was the passage of time,

but the Court found that the timing of the offerings "is perhaps the least significant of all

five factors." 331 B.R. at 548, quoting Wade, 25 Loy. U. Chi. L.J. at 220.

    These determinations would be directly applicable in the instant situation but for

the possible applicability of Rule 152 as a safe harbor.  To quote the District Court,

however, there "are simply too many tangled facts at play" to provide any assurance that

the Rule 152 exemption would be applicable here, especially as the SEC has failed to

give Multicanal a no-action letter.  *Multicanal III*, 331 B.R. at 547.  It must be recalled

that Multicanal determined not to register the securities to be offered in its APE under the

U.S. securities laws because it did not want to delay the offer or make it subject to the

uncertainties of the U.S. regulatory process.  Multicanal has now gone to the significant

time and expense of drafting and filing a registration statement, but that statement can

benefit only certain holders and must be withheld from the consenting holders in order to

prevent them from requiring a re-vote.  Multicanal's position is fundamentally at odds

with the purposes of the securities laws, and the only certainty is that proceeding under

Rule 152 without an SEC no-action letter would ensure years of uncertainty, litigation,

and a possible failure to close the APE while appeals are heard in our courts. This would

not be consistent with the purpose and goal of § 304 to "best assure an economical and

expeditious administration" of the foreign estate.

### III. Standing

The District Court remanded with the suggestion that the Court consider the

question of Huff's standing to oppose entry of an order under § 304 recognizing the APE:

> It appears that Huff objects on behalf of [a] number of creditor interests,
> including creditors of Multicanal which would qualify as QIBs, some of
> whom may have voted in favor, and some in opposition, to the APE.
> Possibly, Huff has a conflict in its representation. The Bankruptcy Court,
> following remand, might consider the propriety of Huff's continued
> voicing of the various interests it purports to represent.

*Multicanal III*, 331 B.R. at 551.

There is no question that Huff, through its counsel, initially opposed entry of an

order under § 304 by asserting the rights and interests of both U.S. QIBs and retail

holders, but as found in *Multicanal II*, Huff's clients included both QIBs and non-QIB

retail purchasers of the notes in the United States. *Multicanal II*, 314 B.R. at 496. In the

initial proceedings before this Court, Huff also moved to intervene at least one non-QIB,

Willard Alexander, who was a § 303 petitioner and a named appellant before the District

Court. The formal intervention of non-QIBs was found not to be necessary, but the Court

considered and sustained objections to the § 304 petition that protected the interests of the

retail holders in the U.S., noting that Multicanal appeared to have abandoned its standing

argument and that the Court also has an obligation, in any event, to analyze the § 304(c)

factors and determine whether recognition is appropriate. 314 B.R. at 516 n.18.

It is appropriate to consider the standing issue again on remand, especially as Huff

is now, in part, pleading the case of "yes" voters when it complains that a "partial

registration" of the offering would leave them with a less valuable security than others would receive and that they would not have voted in favor of the APE had they known of this eventuality.  Nevertheless, once again, Huff is not asserting the rights of others in the abstract.  It has itself bought some notes from holders who originally voted "yes."  Two "yes" voters, Robert Tractman (a non-QIB) and Deutsche Bank (a QIB), have also appeared before the Court in support of Huff's position.  Tractman sought to intervene in the earlier proceedings before this Court and on remand submitted a supplemental declaration, confirming that Huff could oppose recognition of the APE on his behalf and offering to appear if necessary or appropriate.  Deutsche Bank similarly filed papers on remand, stating its willingness to participate in the proceedings, and its counsel appeared at oral argument in opposition to the APE.

There is no question that "Generally, litigants in federal court are barred from asserting the constitutional and statutory rights of others in an effort to obtain relief for injury to themselves."  *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 643 (2d Cir. 1988).  As the Circuit Court said there, third-party standing "is of special concern in the bankruptcy context where, as here, one constituency before the court seeks to disturb a plan of reorganization based on the rights of third parties who apparently favor the plan."  *Id*. at 644.  That principle would be relevant here except for several countervailing considerations.  First, Huff not only directly represents retail and QIB holders who oppose recognition of the APE, but it has brought forward as proposed intervenors "yes" voters who are complaining of direct injury from lack of registration of the securities offering and who assert, in effect, that they would not have voted in favor of receiving an

unregistered security had they known that a "no" vote would have entitled them to a registered security.

Moreover, the questions on remand concern whether Multicanal has proposed a cure consistent with the U.S. securities laws. The main issue under § 3(a)(10) is the availability of a fairness hearing open to all interested parties. Even if Huff represented only "no" voters and retail voters, Huff should have standing to be heard on all aspects of the availability of an exemption under § 3(a)(10). The main issue under Rule 152 is whether the offer to the "yes" voters, and the later offer to the retail holders and the "no voters," must be integrated because of the policies of the securities laws and practice thereunder. Even if Huff represented only retail voters and the "no" voters, it ought to be able to argue that there was one single integrated offering by pointing to the impact of a contrary judicial ruling on the rights of other offerees.

## CONCLUSION

For the reasons stated above, the Court concludes that Rule 152 does not provide a safe harbor under the U.S. securities laws that would permit the APE to close promptly, absent the issuance of an SEC no-action letter. Multicanal cannot claim a § 3(a)(10) exemption as a matter of law at this time, but as the District Court suggested, a § 3(a)(10) exemption might nonetheless be available after a "fairness hearing" conducted on notice. At the fairness hearing, there could also be a determination whether there has been such a long passage of time since the APE vote that it would be fundamentally unfair to enforce the vote at this time.

Multicanal should settle an appropriate order on 5 days' notice, making clear how it proposes to proceed. As the District Court and this Court have suggested, there may be

"an alternate cure" open to Multicanal other than pursuant to § 3(a)(10) or Rule 152.

*Multicanal III*, 331 B.R. at 551; *Multicanal II*, 314 B.R. at 519.  However, both the

District Court and this Court have expressed concern over the passage of time and the

effect of delay on all affected creditors, and the Court is certain that this concern is shared

by the courts in Argentina.  Therefore, it is important that the parties proceed promptly.


Dated:  New York, New York
         March 29, 2006

                              */s/ Allan L. Gropper*
                              UNITED STATES BANKRUPTCY JUDGE